**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BP AMERICA, INCORPORATED, a
Delaware corporation,
<u>Plaintiff-Appellant,</u>

v.                                                                  No. 97-2003

NORFOLK AND WESTERN RAILWAY
COMPANY, a Virginia corporation,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Southern District of West Virginia, at Huntington.
Joseph Robert Goodwin, District Judge.
(CA-96-1838-3)

Argued: January 27, 1998

Decided: June 29, 1998

Before ERVIN and MICHAEL, Circuit Judges, and BRITT,
Senior United States District Judge for the
Eastern District of North Carolina, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Brian Alexander Glasser, BOWLES, RICE, MCDAVID,
GRAFF & LOVE, Charleston, West Virginia, for Appellant. Luke
Andrew Lafferre, HUDDLESTON, BOLEN, BEATTY, PORTER &
COPEN, Huntington, West Virginia, for Appellee. **ON BRIEF:**

Charles M. Love, III, BOWLES, RICE, MCDAVID, GRAFF & LOVE, Charleston, West Virginia, for Appellant. Fred Adkins, HUDDLESTON, BOLEN, BEATTY, PORTER & COPEN, Huntington, West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Plaintiff-appellant, BP America (BP), is incorporated in Delaware and has its principal place of business in Ohio. Defendant-appellee, Norfolk and Western Railway Co. (N&W), is incorporated and has its principal place of business in Virginia. (Joint Appendix, hereinafter "JA", 5-6, 42-43.) The amount in controversy exceeds $50,000, exclusive of costs and interest.[1] (Id.) Jurisdiction is therefore properly based upon diversity of citizenship. 28 U.S.C. § 1332. BP filed an action for declaratory judgment pursuant to 28 U.S.C. § 2201. Appellate jurisdiction is proper in that the District Court decided the action in favor of N&W on cross-motions for summary judgment, and BP filed a timely notice of appeal. (Id. 87.)

A district court's granting of summary judgment is reviewed de novo. Jackson v. Kimel, 992 F.2d 1318, 1322 (4th Cir. 1993).

I. BACKGROUND

This is an appeal of the granting of summary judgment in a declaratory judgment action concerned with a contract of indemnity under the laws of West Virginia. BP, the indemnitor, asked the court below to declare that N&W, the indemnitee, is not entitled to indemnifica-

_____

[1] This action was filed prior to the increase of the amount in controversy to $75,000. 28 U.S.C. § 1332 (1996).

2

tion because N&W breached a duty of good faith and fair dealing by refusing to settle an action involving a covered liability. The District Court held that an indemnitee does not owe an indemnitor a duty to settle a claim for any amount.

On 15 October 1987, Old Ben Coal Company (Old Ben) employee Hence Sesco (Sesco) injured his back when he slipped on coal dust and fell while working inside a N&W rail car. At that time, N&W provided rail service to Old Ben, which was then owned by BP. The provision of this service was governed by a Lease of Side Track contract entered into by Old Ben and N&W on 1 October 1981. Paragraph 7(b) of the contract states:

> Industry (Old Ben) covenants and agrees to indemnify, protect and save harmless the Railway (N&W), its officers, agents and employees, from and against any and all loss of or damage to any property whatsoever . . ., and any and all loss or damage on account of injury to and death of any person whomsoever (including employees and patrons of the parties hereto and all other persons whomsoever), and from and against any and all suits, claims, liabilities and demands, for such loss or damage, and any costs or expenses in connection therewith, caused by or growing out of the operation of this lease or the presence of cars, or their contents, on the Premises except where loss or damage, other than by fire caused by locomotives as aforesaid, is due to the sole negligence of the Railway.

(JA 60.)

Sesco immediately received workers' compensation benefits pursuant to BP's coverage.[2] Eighteen months after the incident, Sesco informed N&W of his injuries. On 1 June 1989, N&W sent an agent to meet with the Sescos, and settlement was discussed but not reached. On 11 October 1989, the Sescos filed suit against N&W. By letter dated 2 January 1990 from N&W to BP, N&W demanded that BP defend it in the Sesco suit under Paragraph 7(b) recited above. By

---

[2] For ease of reference, BP and Old Ben will be collectively referred to as "BP" for the remainder of this opinion.

3

letter dated 11 January 1990, BP agreed to assume N&W's defense. Counsel for N&W, hired and paid by BP, answered the complaint and filed a motion to dismiss for failure to state a claim upon which relief could be granted. The court granted the motion and dismissed the action. The Sescos appealed, and the West Virginia Supreme Court of Appeals reversed and remanded, stating that the dismissal had been premature. Sesco v. Norfolk and Western Ry. Co. , 427 S.E.2d 458, 461 (W.Va. 1993).

BP continued to defend the matter until the Sescos amended their complaint to allege primarily a products liability claim against N&W. By letter dated 11 April 1994 to the attorney whom BP was paying to defend N&W, BP stated that it was withdrawing its defense of N&W because the new counts in the amended complaint alleged the sole negligence of N&W. (JA 70.) N&W then assumed the defense of the Sesco case itself. (Id. 48.)

By stipulation of the Sescos and N&W, the product liability claims were dismissed on 6 December 1994, leaving the Sescos to proceed on their original claims of common law negligence. N&W did not notify BP of this change in the nature of the case and did not attempt to return the defense to BP. However, employees of BP knew that the case was continuing because their employees were being deposed and subpoenaed. (Id. 51.)

The Sescos made their first settlement demand in the amount of $1,000,000.00 on 30 March 1995. N&W refused the offer without discussing the matter with BP, and settlement was not discussed again until the week of trial when the Sescos lowered their demand to $350,000.00. At that time, N&W knew the following: (1) Sesco's out-of-pocket medical expenses exceeded $50,000.00 (JA 53); (2) Sesco's damages could exceed $600,000.00 (JA 53); (3) Sesco's economist would testify that Sesco's lost wages to trial date exceeded $400,000.00, and his total lost wages would exceed $1.3 million. (JA 73.) N&W countered with an offer of $40,000.00 and did not discuss the matter with BP.

In response to these settlement discussions, the trial judge asked the Sescos' lawyers to determine if the matter could be settled for

4

$250,000.00. The Sescos' attorneys then demanded $250,000.00 to settle. N&W again did not inform BP of the settlement offer. (JA 54.)

The case proceeded to trial in May 1995 on common law claims comparable to those alleged in the original complaint. (JA 49, 53.) On 16 May 1995, the jury returned a verdict for the Sescos in the amount of $963,687.16 exclusive of costs and interest. In July 1995, during the pendency of the appeal of the jury verdict, N&W notified BP of the status of the case and demanded indemnification for the verdict.[3] The appeal of the verdict was ultimately denied, and N&W paid the Sescos $1.39 million, inclusive of interest and costs.

BP then filed the instant declaratory judgment action. The question before us is whether, as a matter of West Virginia contract law, N&W, as indemnitee, breached any duty of good faith it may have owed to BP, as indemnitor, when it did not settle a covered liability. For the reasons stated below, we answer the question in the negative.

## II. DISCUSSION

There are two types of indemnity, express and implied. This case involves express indemnity, as it is based upon paragraph 7(b) of the written Lease of Sidetrack agreement. Express indemnity agreements are based upon and governed by contract principles. VanKirk v. Green Const. Co., 466 S.E.2d 782, 789 (W.Va. 1995), cert. denied, 116 S.Ct. 2571 (1996). West Virginia law is clear that "the plain meaning of a contract's terms must be given full effect." Moore v. Chesapeake & O. Ry. Co., 649 F.2d 1004, 1012 (4th Cir. 1981) (citing Nisbet v. Watson, 251 S.E.2d 774 (W.Va. 1979)). It is also established law that every contract carries with it an implicit duty of good faith. Restatement (Second) of Contracts § 205. The exact implications of this general contract principle in the context of indemnity agreements under the law of West Virginia are unclear, because there is no West Vir-

_____

[3] N&W actually notified Old Ben's new owner, Zeigler Coal Holding Co., which then tendered the offer to BP, as BP remained liable for the Sesco matter pursuant to indemnity provisions of a Stock Purchase Agreement between Zeigler and BP.

5

ginia case holding that there is a duty of good faith in indemnity contracts.[4]

However, the West Virginia Courts have addressed the duty of good faith in the analogous context of a surety-bond contract. In Fidelity & Casualty Co. of New York v. McNamara, 36 S.E.2d 402 (W. Va. 1945), the principal (McNamara) promised to indemnify the surety-indemnitee if the surety had to pay the bond. The court, relying on Fidelity & Casualty Co. of New York v. Harrison, 274 S.W. 1002 (Tex. Civ. App. 1925), read a good faith requirement into the surety agreement, explaining that if it did not:

> a solvent principal on a surety bond would run the risk of having a surety company, either through carelessness or actual bad faith, make an unreasonable settlement disadvantageous to the principal. In such a case the surety would have nothing to lose by an unfavorable settlement. It would simply be dealing with the principal's money without any risk to itself.

McNamara, 36 S.E.2d at 404. The court rejected this result, stating:

> [t]he conflicting interests between principal and surety under a contract of suretyship . . . must be solved in the public interest, which requires that the parties be protected against possible wrongdoing of each other, and that can only be done by reading into the contract a provision that good faith be exercised by the surety . . . .

Id.

This reasoning applies to the facts of the case at bar where the indemnitee declined to enter into a settlement agreement. If a settlement is declined in bad faith, the indemnitee would be dealing with

_____

**4** The West Virginia Supreme Court of Appeals has suggested in dictum that an indemnitee may owe an indemnitor a limited duty of good faith. See Riddle v. Allied Chem. Corp., 378 S.E.2d 282, 286 n.8 (W. Va. 1989) ("Where a party is given full express indemnification it is obliged to exercise a degree of good faith to its indemnitor.")

6

the "[indemnitor's] money without regard to the [indemnitor's] interest and without any risk to itself."

Valloric v. Dravo Corp., 357 S.E.2d 207 (W.Va. 1987), is also instructive on the question of an implied duty of good faith and addresses the issue in the indemnity context. In that case, the court states that in order to prevail on an indemnity claim, the indemnitee, even after (1) giving notice, (2) affording an opportunity to defend, and (3) affording an opportunity to participate in the settlement, must still (i) show that the original claim was covered, (ii) demonstrate that he was reasonably likely to suffer an adverse judgment, and (iii) prove that the amount of the settlement was reasonable. Id. at 214. Valloric requires an indemnitee to provide the indemnitor an opportunity to participate in settlement, but it does not make settlement a requirement for enforcement of the agreement. However, it could be argued that this participation requirement imposes a duty of good faith upon parties to indemnity contracts which covers failures to settle as well as actual settlements.

While there may be a duty incumbent upon indemnitees to exercise good faith in indemnity contracts, that duty was not breached in the case at bar.

In VanKirk, the West Virginia Court further discussed indemnification agreements and duties pursuant to them. It explained:

> [w]here an indemnitor is given reasonable notice by the indemnitee of a claim that is covered by the indemnity agreement and is afforded an opportunity to defend the claim and fails to do so, the indemnitor is then bound by the judgment against the indemnitee if it was rendered without collusion on the part of the indemnitee.

Id. at Syl. Pt. 6. Quoting Section 56a of 42 C.J.S. Indemnity (1991), the VanKirk court continued:

> [w]here the indemnitor is notified of the pendency of an action against the indemnitee in reference to the subject matter of the action, the judgment in such action, if obtained

7

without fraud and collusion, is conclusive on the indemnitor as to all questions determined therein which are material to a recovery against him in an action for indemnity brought by the indemnitee; and it is not open to collateral attack by the indemnitor, and the judgment is conclusive against the indemnitor whether or not he appears and defends. . . .

[West Virginia] indemnity law is consistent with that of other jurisdictions where courts hold that an indemnitor given reasonable notice by the indemnitee is obligated to assume the defense and, if the indemnitor does not, then it is bound by the judgment.

VanKirk, 466 S.E.2d at 789-90 (footnotes and citations omitted).

Finally, the VanKirk court commented that the law of West Virginia is clear that a judgment against an indemnitee has a res judicata or collateral estoppel effect when a suit is filed against the indemnitor. The court stated that such a judgment

precludes the indemnitor from relitigating issues, such as the indemnitee's liability to the injured party or the amount of damages awarded. Also foreclosed are other issues that were litigated in the former action defended by the indemnitee. This rule is tempered by the ability of the indemnitor to show the judgment against the indemnitee was collusively obtained . . . .

VanKirk, 466 S.E.2d at 791. Based upon this statement, West Virginia law clearly imposes upon an indemnitee a duty to refrain from collusive settlements and judgments. There is no evidence of fraud or collusion between N&W and the Sescos. In fact, BP admits that N&W vigorously and properly defended the suit from the time BP turned the defense over to it until the ultimate conclusion. (JA 49, 53, 55.) Thus, it would appear that the judgment is immune from collateral attack by BP.

Additionally, BP had notice of the claim and had an opportunity to defend the matter. BP had notice of the Sescos' suit before handing

8

it to N&W because of a change in the nature of the claims. On this point, N&W argues that once BP gave the case back to it to defend, BP was willfully ignorant of the status of the matter and there was no duty to reinvolve it in the matter. BP never requested to be kept informed of the progression of the case. The fact that the focus of the case changed from one of product liability to one of simple negligence was a matter of public record, yet BP never inquired about it after handing the defense of the litigation back to N&W. (JA 49.)

Essentially, BP relinquished its involvement in the defense to N&W, after having had notice of the claim, and now argues that N&W acted in bad faith by not continuing to consult it before making any decisions as to the resolution of the claim. All the while, BP never initiated an inquiry as to the status of the matter. BP ended its defense at its own risk, given its knowledge of potential liability. Being a sophisticated party, BP could have negotiated for a provision in the indemnification agreement requiring that it be informed of settlement discussions. It also could have monitored the case or intervened in the suit as a third party. See VanKirk , 466 S.E.2d at 791-94.

Therefore, we hold that where a corporate indemnitor ends its defense of an indemnitee in a suit in which the indemnitor was still liable on existing claims, the indemnitee does not owe a duty to advise the indemnitor of settlement discussions. The decision of the District Court is

AFFIRMED.